# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHER DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **BLETCHLEY HOTEL AT O'HARE FIELD LLC,** <br><br>         Appellant, <br><br>      v. <br><br> **RIVER ROAD HOTEL PARTNERS, LLC and FBR CAPITAL MARKETS & CO.,** <br><br>         Appellees. | Appeal from the United States Bankruptcy Court for the Northern District of Illinois, Eastern Div. Bankr. Case No. 09-bk-30029 <br><br> Case No. 15 C 8063 <br><br> Judge Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

Before the Court is an appeal from a judgment by the United States Bankruptcy Court for the Northern District of Illinois brought by Bletchley Hotel at O'Hare Field LLC ("Bletchley"), and the cross-appeal of FBR Capital Markets & Co. ("FBR"). FBR also moves to have Bletchley's appeal dismissed as frivolous, [ECF No. 31]. For the reasons stated herein, the decision of the Bankruptcy Court is affirmed, and FBR's Motion is denied.

### I. BACKGROUND

This appeal stems from the bankruptcy of River Road Hotel Partners, LLC and its affiliates ("the Debtors"). The bankruptcy relates to the commercial failure of the former Intercontinental Hotel at O'Hare Airport, which opened its doors right before the start of the financial crisis in 2008. When

the business went south and the Debtors began to contemplate Chapter 11 bankruptcy, they hired FBR as their financial advisor to oversee a planned restructuring. The parties signed an engagement letter in August of 2009 detailing the terms of their agreement. The Bankruptcy Court officially approved Debtors' retention of FBR in September of 2009 in a court order ("the Retention Order"). The interplay between language in the engagement letter and the Retention Order form the bulk of the basis for this appeal.

The engagement letter set out several types of fees that Debtors would pay to FBR for its work. Central to this dispute is the "restructuring fee," a fee contingent on an eventual restructuring. FBR performed services under the contract for 22 months and still had not closed a deal when a third-party, Amalgamated Bank, proposed its own Chapter 11 restructuring plan, pursuant to which the Debtors would lose all of their assets. The Bankruptcy Court approved Amalgamated's plan on July 7, 2011. The plan created Bletchley Hotel at O'Hare LLC ("Bletchley"), which was responsible for the payment of expenses and is the entity bringing this appeal. FBR's efforts as financial advisor thus failed; it was not the party responsible for the final, successful restructuring.

Whether FBR is entitled to the restructuring fee turns on how the relevant documents define the fee. It was "payable

concurrently with the consummation of any Restructuring." (App. Appellants' Br. Ex. 3). The engagement letter defined a "restructuring," in relevant part, as "any restructuring, reorganization and/or recapitalization . . . that involves all or a significant portion of the Company's outstanding indebtedness." *Id*. The fee amount was to be computed as a percentage of the total indebtedness involved in the final transaction.

At first blush, this all seems simple enough: the restructuring fee was payable upon the occurrence of any restructuring, regardless of whether it was completed by FBR. This Court previously held, however, that the Bankruptcy Court's Retention Order implementing the terms of the engagement letter created some ambiguity surrounding the fee. *See, FBR Capital Markets & Co. v. Bletchley Hotel at O'Hare LLC,* 2013 WL 5408848 (N.D. Ill. September 24, 2013). Specifically, the Retention Order stated that the payment of the restructuring fee would be "contingent upon the consummation of a restructuring contemplated by the engagement letter." (App. Appellants' Br. Ex. 4). Of that language, this Court previously observed: "By indicating that some restructurings would be contemplated by the Engagement Letter and others would not, the Retention Order creates an ambiguity regarding which restructurings count. Even though the Engagement Letter is broad, it does not answer that

question." *FBR,* 2013 WL 5408848, at *3. Due to the ambiguity, the Court remanded the case back to the Bankruptcy Court for a bench trial to consider extrinsic evidence and decide which restructurings were contemplated under the agreement.

The evidence introduced at trial proved inconclusive on this issue. The Bankruptcy Court's findings of fact adeptly explain the impasse, *see, In re River Road Hotel Partners, LLC,* 520 B.R. 691 (Bankr. N.D. Ill. 2014); the following is only a brief recap. FBR's witnesses testified that they understood the contract at the time of drafting in the terms most favorable to their side. For example, Brian Taylor, a director at FBR who helped draft the engagement letter, testified that he did not intend the restructuring fee's payment to be conditioned on FBR's success as opposed to some other party. He claimed that FBR never would have accepted such a deal. Steven Goldberg, another key employee of FBR, made similar statements when deposed. David Neff, counsel for the Debtors, had input into the proposed Retention Order. He made some modifications to a draft, but added no language to make payment of the restructuring fee explicitly contingent on FBR's closure of a deal. At trial, he did not offer a clear rationale for why he failed to include more specific language that would support the interpretation of the engagement letter now advanced by Bletchley. Neff merely insisted that the Retention Order should

reflect that payment of the fee be contingent on a restructuring "contemplated by the engagement letter." And to reiterate, the engagement letter broadly defines a restructuring without reference to a particular party.

The Bankruptcy Court ultimately found that the Debtors were responsible for the ambiguity and so it should be construed against Bletchley; the court thus ruled in favor of FBR and ordered Bletchley to pay the restructuring fee. This Court reviews the Bankruptcy Court's findings of fact for clear error, and reviews questions of law *de novo*. *See, In re Kerns*, 111 B.R. 777 (S.D. Ind. 1990).

## II. <u>**BLETCHLEY'S APPEAL**</u>

Bletchley makes several arguments claiming the court erred, but none are convincing. For example, it claims the bankruptcy court analyzed the case as if there were no ambiguity, but that's clearly false. The court's opinion is replete with references to the ambiguity and efforts to resolve it. Bletchley makes two other material arguments for how the bankruptcy court erred: that the court (1) misunderstood who carried the burden of proof, such that when the extrinsic evidence established a tie, FBR had failed to carry its burden and should have lost; and (2) erred in construing the ambiguity against Bletchley (applying the principle of *contra proferentem*). The Court need not consider these arguments

however, because it finds the evidence amply supports an inference that the Debtors intended to pay the restructuring fee all along. Therefore, even if the bankruptcy court did err in its analysis, the error was harmless.

The negotiations leading up to the final version of the engagement letter reveal much about the parties' intentions. In addition to the restructuring fee, the Debtors agreed to pay FBR a one-time retention fee and a recurring monthly fee. In the initial draft of the engagement letter, the retainer was set at $165,000, the monthly fee was set at $165,000 per month, and the restructuring fee was set at 90 basis points of the total indebtedness attendant to a final restructuring. The next draft lowered the retainer and monthly fees to $150,000 and kept the restructuring fee at 90 basis points. Another draft dramatically reduced the retainer and monthly fees to $20,000, while the restructuring fee increased to 125 basis points. The final draft decreased the monthly fee to only $10,000, set the retainer at $50,000, and increased the restructuring fee again, this time to 135 basis points. FBR director Brian Taylor testified that the monthly fee and retainer in the final draft, which were below the relevant market rates, were reduced because the Debtors were experiencing cash flow issues. FBR's employees further testified that FBR would not have agreed to a $10,000

monthly fee if not for the concomitant increase in the restructuring fee.

There is strong circumstantial evidence from this course of dealing that FBR meant to shift fees for its monthly work into the contingent restructuring fee. A quick breakdown of the numbers bears out this point. FBR worked on the restructuring for about 22 months. At $10,000 per month, that entitled them to $220,000 in monthly fees. Recall that Taylor testified that $10,000 was below market rate for this type of transaction. Indeed, if FBR had received the $165,000 per month it originally sought in the first draft, it would have been entitled to $3.6 million in monthly fees alone, all else being equal. Now consider the increase in the restructuring fee: 135 basis points of total indebtedness entitled FBR to a $2.4 million restructuring fee after Amalgamated swept in and closed a deal. That means the total indebtedness involved in the transaction was roughly $178 million. If FBR had received 90 basis points, as contemplated in the initial draft of the engagement letter, the restructuring fee would have equaled about $1.6 million. The upshot is that the amount FBR gained by increasing the restructuring fee (about $800,000) was nowhere near sufficient to offset the amount it lost by substantially lowering the monthly fee (around $3.3 million for 22 months of work).

So it is extremely unlikely FBR meant to take on more risk by increasing the restructuring fee and tying it exclusively to their success; it is much more likely that FBR only meant to delay receipt of full payment for its services due to the Debtors' cash flow problems. It accomplished this by drastically lowering the initially-contemplated monthly fees and raising the restructuring fee, which it intended to collect regardless of who facilitated the final restructuring. If the Debtors did not realize this, they should have; the negotiations coupled with the broad definition of "restructuring" in the engagement letter strongly suggest that FBR is entitled to the fee. Moreover, this is not the only agreement of its type to define broadly the term "restructuring fee" and to entitle the financial advisor to contingent fees regardless of who closes the deal. *See, In re Borders Group, Inc.,* 2011 WL 6026158, at *3-5 (Bank. S.D.N.Y. December 5, 2011).

In an unrelated argument, Bletchley contends that another Bankruptcy Court in this district – a court different from the one that conducted the bench trial at issue here – erred by concluding FBR lacked the disinterestedness required to be appointed as financial advisor. *See,* 11 U.S.C. 327(a). That argument has been waived. Judge Black ruled on this issue in 2012 when deciding a motion for summary judgment brought by FBR. *See, In re River Road Partners, LLC,* 2012 WL 6585506 (Bankr.

N.D. Ill. December 17, 2012). He denied the motion and granted summary judgment *sua sponte* for Bletchley. That was a final, appealable order at the time; FBR appealed to this Court, objecting to the portion of the opinion that denied it the restructuring fee. Bletchley did not cross-appeal, and at no point in those proceedings did it raise an argument about FBR's disinterestedness. *See,* Case No. 1:13-cv-00746. So when this Court remanded back to the Bankruptcy Court for proceedings related to the restructuring fee, the question of disinterestedness was already waived and as a result, not within the scope of the remand. *See, United States v. Husband*, 312 F.3d 247, 250-51 (7th Cir. 2002) ("[A]ny issue that could have been but was not raised on appeal is waived and thus not remanded.").

### III. **FBR'S CROSS-APPEAL**

FBR cross-appeals, and argues that the Bankruptcy Court erred by denying it reimbursement for its legal expenses related to this litigation. It seeks $1.8 million, mostly attributable to the attorneys' fees it paid in defense of its request for the restructuring fee. But the Bankruptcy Court correctly denied this request.

A professional such as FBR is approved by the Bankruptcy Court and employed pursuant to 11 U.S.C. § 327. Two sections govern compensation for such a professional; the one at issue on

FBR's cross-appeal is Section 330. Section 330 states that "the court may award . . . reasonable compensation for actual, necessary services rendered . . . and reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A)-(B). That Section further provides that "[i]n determining the amount of reasonable compensation to be awarded . . . the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors . . . ." 11 U.S.C. § 330(a)(3). The Bankruptcy Court's Retention Order provided that "the reimbursement of all FBR's out-of-pocket expenses shall be subject to further review and approval by the Court pursuant to section 330 of the Bankruptcy Code. . . ." (App. Appellants' Br. Ex. 4).

Both the Debtors and the United States Trustee (who filed a brief as *amicus curiae*) argue that FBR's position on reimbursement is foreclosed by a recent Supreme Court decision, *Baker Botts LLP v. ASARCO LLC,* 135 S.Ct. 2158 (2015). *ASARCO* involved attorneys appointed as professionals under Section 327 who performed legal services for a debtor; afterward, the attorneys requested fees, which the debtor's parent company challenged. The attorneys ultimately were awarded fees for their work done for the bankruptcy estate under Section 330, but they were denied reimbursement for the legal expenses incurred in litigating over those fees (similar to the present case).

The attorneys appealed, arguing that they were entitled to compensation for the time spent litigating their fee applications.

The Supreme Court disagreed, holding that "[b]ecause § 330(a)(1) does not explicitly override the American Rule with respect to fee-defense litigation, it does not permit bankruptcy courts to award compensation for such litigation." *ASARCO*, 135 S.Ct. at 2169. The "American Rule," of course, simply dictates that each party is responsible for its own attorneys' fees unless a statute or contract provides otherwise. Crucial to the Supreme Court's decision was the statutory language of Section 330(a)(1): compensation is available "only for '*actual, necessary services rendered*.'" *Id*. at 2165 (quoting 11 U.S.C. § 330(a)(1)). The Supreme Court went on to explain: "Time spent litigating a fee application against the administrator of a bankruptcy estate cannot be fairly described as labor performed for — let alone disinterested service to — that administrator." *Id*. (internal quotations omitted). And Section 330(a)(1) allows only compensation for work performed *in service* of the bankruptcy estate.

*ASARCO* is directly on point – FBR may not receive compensation for its fee-related litigation under Section 330(a)(1). FBR counters that this case is different, because it involves a non-legal professional, as opposed to the

lawyers in *ASARCO*. But according to the Supreme Court, that's an irrelevant distinction; Sections 327(a) and 330(a) apply to all professionals, and *ASARCO*'s discussion is cast in broad language to include all professionals, not just attorneys. Nor is it relevant that FBR already paid the fees to its attorneys and now seeks "reimbursement" rather than a direct payment for services – FBR still seeks compensation for funds expended in fee-related litigation, which brings the matter directly under *ASARCO*'s ruling. FBR's attempt to differentiate meaningfully Section 330(a)(1)(A) from 330(a)(1)(B) fails also, because *ASARCO* explicitly cited both of those subparts and held, "This text cannot displace the American Rule with respect to fee-defense litigation." *ASARCO,* 135 S.Ct. at 2165.

FBR's strongest argument is that the engagement letter acts as a stand-alone contract, providing that FBR will be reimbursed for legal fees and expenses "in connection with" its services or for expenses incurred "related to or result[ing] from [] performance . . . of the services contemplated by . . . this agreement." (App. Appellants' Br. Ex. 3). Therefore, FBR contends, under a straightforward interpretation, the engagement letter overrides the default American Rule, and entitles FBR to reimbursement for its fee-related litigation. But the Bankruptcy Court's Retention Order is a companion document to the engagement letter that authorized and implemented the terms

of the engagement; in doing so, it supplemented the engagement letter with the following stipulation: "[T]he reimbursement of all FBR's out-of-pocket expenses shall be subject to further review and approval by the Court pursuant to section 330 of the Bankruptcy Code." By making out-of-pocket expenses subject to Section 330 review, the Retention Order bound the Bankruptcy Court to abide by the statute. The Supreme Court in *ASARCO* was animated in part by deference to legislative intent in drafting Section 330 and the public policy behind it: Compensation reviewed under that section should be limited to compensation for work performed in service of the bankruptcy estate, and cannot include fees for work a professional completes on its own behalf. *ASARCO,* 135 S.Ct. at 2165. The Bankruptcy Court had to consider compensation in that context and thus was correct to deny FBR the $1.8 million in attorneys' fees and costs.

FBR also believes it is entitled to the attorneys' fees on separate grounds, solely because Bletchley's litigation has been "vexatious." In fact, FBR now raises a litany of abuses that Bletchley allegedly perpetrated below in the bankruptcy proceedings. If that's true, FBR should have moved for sanctions at the time (it never did). To show now that the Bankruptcy Court erred in not awarding attorneys' fees for misconduct, FBR needs evidence of objective bad faith on the part of Bletchley in pursuing this litigation. *See, Dal Pozzo*

*v. Basic Machinery Co.*, 463 F.3d 609, 614 (7th Cir. 2006). But this Court previously found that the parties' agreement was ambiguous and remanded for a trial on the issue of fees. Bletchley was unhappy with the result, but this Court's opinion and the Bankruptcy Court's findings of fact obviously demonstrate the questions were thorny and not free from doubt. Bletchley appealed a close question, as was its right; there is nothing to suggest that it did so in bad faith. FBR's request for attorneys' fees on this basis is denied as well. And for the same reasons, the Court denies FBR's separate Motion to Dismiss Bletchley's appeal as frivolous.

## IV. CONCLUSION

For the reasons stated herein, the Court affirms the decision of the Bankruptcy Court and denies FBR's Motion to Dismiss the appeal as frivolous [ECF No. 31]).

**IT IS SO ORDERED.**

                              Harry D. Leinenweber, Judge
                              United States District Court

Dated: August 4, 2016